IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTHONY ASPAAS,

      Plaintiff,

vs.                                                                  1:21-cv-00500 LF-KK

XAVIER BECERRA, SECRETARY,
U.S. Department of Health and Human Services,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on defendant Xavier Becerra, Secretary of the

Department of the Health and Human Services'[1] Motion for Summary Judgment filed on July

15, 2022 (Doc. 22), which was fully briefed on September 12, 2022.  Docs. 28, 38.  Having read

the submissions of the parties, the relevant law, and being fully advised, the Court finds that

there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter

of law.  Accordingly, the Court GRANTS the motion and dismisses plaintiff Anthony Aspaas's

Complaint (Doc. 1) with prejudice.

This case arises from Mr. Aspaas's separation from his employment with the United

States Department of Health and Human Services ("HHS") as a Supervisory Clinical Nurse

("SCN") in the Specialty Clinic at the Chinle Comprehensive Health Care Facility ("CCHCF")

in Chinle, Arizona.  After CCHCF terminated Mr. Aspaas's employment, he sued defendant,

alleging retaliation, failure to accommodate his disability, and gender discrimination.  Doc. 1.

---

[1] Secretary Becerra is not directly involved in the events that are involved in this lawsuit;
however, Indian Health Services is a component agency of the Department of Health and Human
Services which operates the Chinle Comprehensive Health Care Facility in Chinle, Arizona.
Therefore, Mr. Becerra, in his official capacity, is the proper defendant in this case.  *See* 42
U.S.C. § 2000e-16(c).

Defendant filed a motion for summary judgment arguing that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law on all of Mr. Aspaas's claims.  Doc. 22.  Mr. Aspaas opposes the motion.  Doc. 28.

## I.   **Legal Standard**

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED R. CIV. P. 56(a).  A fact is "material" if under the substantive law it could affect the outcome of a lawsuit, and an issue is "genuine" if a rational juror could find in favor of the nonmoving party on the evidence presented.  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment.  *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment."  *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005)

(alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the [nonmoving party's] evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

## II.   Statement of Facts

### A.   Mr. Aspaas Fails to Properly Dispute Defendant's Facts.

As an initial matter, Mr. Aspaas purportedly disputes almost all the facts the defendants rely on in their motion. *See* Doc. 28 at 2.[2] He fails, however, to comply with both the Federal Rules of Civil Procedure and this district's local rules when addressing the defendant's statement of material facts. Rule 56(c) provides that "a party asserting that a fact is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record. . .; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c).

---

[2] Mr. Aspaas "asserts" that defendant's Exhibits 3 (Doc. 22-3), 4 (Doc. 22-4), 23 (Doc. 22-23), and 41 (Doc. 22-41) should be struck from the record as unverified affidavits, hearsay, redacted, unsigned, or incomplete. Doc. 28 at 2 n.1. Mr. Aspaas does not explain which objection applies to which document, nor does he explain how the objections would provide cause for the Court to strike each document. Summary judgment evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), as amended on reh'g (Nov. 8, 2016). The Court has reviewed each document and concludes that for the purposes of this motion, the content or substance of the evidence is admissible; it will not strike the exhibits. *See infra* nn.5, 6, 13, 21.

The Court's local rules require that "[e]ach fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). Instead of following the rules, Mr. Aspaas states that he "denies" certain paragraphs and states that "the facts that show the above are disputed are stated in parenthesis and throughout the brief." *See* Doc. 28 at 2.[3] This statement in no way complies with the rules; therefore, all material facts set forth in defendant's memorandum are deemed undisputed unless specifically controverted.[4]

Further, many of the factual "disputes" are actually additional facts that Mr. Aspaas presumably believes are important or relevant. For the purposes of this order, the Court recounts the facts over which there is no arguable dispute. The Court cites to supporting evidence as necessary, but it does not cite to all the evidence that supports every undisputed fact.

B. <u>Statement of Undisputed Material Facts</u>

Plaintiff Anthony Aspaas was employed by the Department of Health and Human Services ("HHS" or the "Agency") as a Supervisory Clinical Nurse ("SCN") in the "Specialty Clinic" at CCHCF from June 14, 2014, until January 22, 2016. Undisputed Material Fact ("UMF") 1. Mr. Aspaas's duties included monitoring and evaluating the work of his subordinates, approving and disapproving annual and sick leave, effecting minor disciplinary measures such as warnings and reprimands, and recommending other action in more serious

---

[3] The internal page numbers in Mr. Aspaas's response do not match the CM/ECF page numbers; the Court cites to the CM/ECF number in the top righthand corner of each page instead of the internal page numbers in the bottom righthand corner of each page.

[4] The Court notes that counsel for Mr. Aspaas' submitted an "Exhibit Index" (Doc. 28-1) rather than simply citing to each exhibit by letter, which caused the Court to spend an inordinate amount of time correlating the citations in Mr. Aspaas's brief to the exhibits themselves.

cases, and providing "nursing services" directly to patients.  UMF 2.  Mr. Aspaas's direct

supervisor at CCHCF was Assistant Chief Nurse Executive Charlene West.  UMF 3; Doc. 22-3.[5]

### 1. Conduct and Communication Issues

Around March 19, 2015, several staff members complained to Ms. West that during a

meeting with the Specialty Clinic staff, Mr. Aspaas referred to a health technician as an "idiot"

who did not know what she was doing.  UMF 4; Doc. 22-4.[6]  When Ms. West counseled Mr.

Aspaas, he admitted calling the health technician an idiot.  UMF 5.

LuAnn Robertson was a health technician in the Specialty Clinic and under Mr. Aspaas's

direct supervision.  UMF 7.  Because of Ms. Robertson's role on CCHCF's "Incident

Management Team," Ms. Robertson wanted to attend an "emergency management" training

scheduled for March 25–27, 2015.  UMF 7.  Mr. Aspaas denied Ms. Robertson the opportunity

to attend the training because she was pregnant.  UMF 9.[7]  Ms. Robertson reported the incident

---

[5] Mr. Aspaas objects to the use of defendant's Exhibit 3 (Doc. 22-3) to support UMF 3 and asks that the Court strike the exhibit.  Doc. 28 at 2 n.1.  Exhibit 3 is a signed affidavit, the content and substance of which could be testified to and admissible at trial.  Summary judgment evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  *Brown*, 835 F.3d at 1232.  Further, Rule 56 specifically allows a party to support an asserted fact with affidavits or declarations.  FED. R. CIV. P. 56(c)(1).  The Court will not strike Exhibit 3.

[6] Mr. Aspaas objects to the use of defendant's Exhibit 4 (Doc. 22-4) to support UMF 4 and asks that the Court strike the exhibit.  Doc. 28 at 2 n.1.  Exhibit 4 consists of complaints from employees and is not being offered for the truth of the matter asserted in the complaints but is being offered to show that Ms. West received notice of the complaints.  *See* Doc. 38 at 2–3.  Because the statements are not being offered for the truth of the matter asserted, Exhibit 22-4 is not hearsay and is admissible.  *See* FED. R. EVID. 801(c) (defining hearsay as "a statement that: (1) a declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement").  The Court will not strike Exhibit 4.

[7] Mr. Aspaas purports to dispute UMFs 9–11, but instead of asserting facts that demonstrate a genuine dispute, he provides additional facts to explain why he denied Ms. Robertson the training opportunity.  *See* Doc. 28 at 2 (stating that "the facts that show the above are disputed are stated in parenthesis and throughout the brief"); 3–4 (referring to facts that suggest that Mr.

to Ms. West, who reversed Mr. Aspaas's decision and allowed Ms. Robertson to attend the training. UMF 10. When Ms. Robertson returned from the three-day training, Mr. Aspaas tried to change her alternative work schedule, which prompted her to complain to the union and again required Ms. West's intervention. UMF 14. On March 31, 2015, Mr. Aspaas emailed Ms. West a list of 17 examples of Ms. Robertson's "flaws" that he felt Ms. West should "be aware" of. UMF 16. Several of these examples pertained to purported leave abuse issues, such as showing up to work late and leaving early, and other minor conduct or performance issues. *Id*. Mr. Aspaas had no documentation to support the existence of the issues he described about Ms. Robertson or any documentation of his efforts to address the alleged problems. UMF 17. Ms. Robertson was a high-performing employee who had received performance awards and had never been subject to formal discipline. UMF 18. Ms. West felt Mr. Aspaas's conduct toward Ms. Robertson was retaliatory. UMF 19. CCHCF's "Disruptive Behavior" policy prohibits "disruptive behavior, incivility, and bullying that undermines a culture of safety" or retaliation for reporting a complaint or providing information. UMF 6, 15; Doc. 22-6 at 1, 2.

On April 1, 2015, Mr. Aspaas sent an email to the Specialty Clinic that all employees, except for himself and two registered nurses ("RNs"), would no longer work their alternative work schedules ("AWS"); instead, they would all work eight-hour shifts, five days a week, because of various leave "abuses" he had had observed over his ten months at CCHCF. UMF

---

Aspaas did not want Ms. Robertson to attend the training because he was concerned about the safety of both Ms. Robertson and her baby, and he was concerned about hospital liability). Mr. Aspaas contends that Ms. Robertson admitted that he said she could attend, but with medical clearance. Doc. 28 at 4. Whether Ms. Robertson was eventually able to attend the training and under what circumstances is immaterial to what was understood by Ms. West at the time she took disciplinary action against Mr. Aspaas. When Ms. West counseled Mr. Aspaas about Ms. Robertson, she indicated that he was being written up because Ms. Aspaas "brought [Ms. Robertson] in and denied training because of her pregnancy." Doc. 22-5 at 1.

20.  In response, Ms. West emailed Mr. Aspaas asking if he had communicated with his staff about their "leave issues" or documented them in the employees' personnel files.  UMF 21.  Mr. Aspaas admitted that he had not done so.  *Id*.  Ms. West additionally formally requested that he also change his schedule to 8 to 5, Monday through Friday (the same as his supervisees) and "to address these issues effective next pay period."  UMF 22.

On April 16, 2015, Ms. West met with Mr. Aspaas and prepared two separate "discussion sheets"[8] for the incidents that occurred on March 19, March 26, and March 31, 2015.  UMF 23. The first discussion sheet referenced the March 19, 2015, incident in which Mr. Aspaas referred to another employee as an idiot during a staff meeting.  UMF 24.  The second discussion sheet involved the March 26 and March 31 incidents in which Mr. Aspaas: (1) denied Ms. Robertson training because she was pregnant; (2) told Ms. West that his staff was undisciplined and that it was her fault; and (3) attempted to improperly change the schedules of the staff under his supervision.  UMF 25.  Ms. West also advised Mr. Aspaas not to complain about his staff to other supervisors.  UMF 26.

### 2.  *Absent Without Leave (AWOL)*

When requesting leave, the practice at CCHCF was for an employee to request the leave from his or her supervisor and to enter the leave request into the Agency's electronic time and attendance program, called "Integrated Time and Attendance System" ("ITAS").  UMF 27.  On April 21, 2015, all employees within CCHCF were permitted two hours of excused absence from

---

[8] The "discussion sheets" are written warnings as a part of "progressive disciplinary action." Doc. 22-13.  The discussion sheets are signed by Ms. West.  *Id.*  While there is a space for the employee's initials, Mr. Aspaas did not initial the discussion sheets.  *Id.*  Mr. Aspaas contends that he did not receive these discussion sheets, Doc. 28-2 at 7 (Oct. 6, 2020, Tr. at 165:5–8), but he did attend the April 16, 2015, conference with Ms. West where she described the "write ups" to him in person.  Doc. 22-5; Doc. 28-2 at 6 (Oct 6, 2020, Tr. at 161:20; 162:22–163:24).

8 a.m. to 10 a.m. to vote in the Navajo Nation elections.  UMF 29.  Mr. Aspaas was absent an additional two hours on April 21, 2015, from 10 a.m. to noon.  UMF 30.  Prior to this absence, Mr. Aspaas did not request leave from Ms. West, nor was there a pending leave request in ITAS at the time of his absence.  UMF 31.[9]  Department policy provides that non-emergency sick leave should be requested in advance.  UMF 34.

Mr. Aspaas was absent from CCHCF on April 23, 2015, without requesting leave.  UMF 32.[10]  If sick-leave cannot be requested in advance, the employee still must request leave and enter it into the ITAS system upon their return.  UMF 35.  There was no record of a leave request from Mr. Aspaas for April 23, 2015.  UMF 33.[11]  On April 30, 2015, Ms. West issued Mr. Aspaas a memorandum charging him two hours of AWOL for his unexcused absence on April 21, 2015, and four hours of AWOL for his unexcused absence on April 23, 2015.  UMF

---

[9] Mr. Aspaas purports to dispute UMF 31 because he told the house supervisor, Cindy Norris, that he would need extra time to vote, but Ms. Norris did not tell Ms. West.  Doc. 28 at 2 (citing Facts R and S), 5 (Facts R and S).  That Mr. Aspaas sought an alternative process to request leave does not dispute the fact that he had not requested leave from Ms. West or that there was not a pending leave request in the ITAS.  Indeed, Mr. Aspaas admits that he did not follow the proper procedures for requesting leave on April 21, 2015.  Doc. 22-11 at 3 (Tr. at 70:14–71:18, 72:6–25).

[10] Mr. Aspaas purports to dispute UMF 32, citing his additional Fact U.  Doc. 28 at 2.  In Fact U, Mr. Aspaas asserts that he sought emergency care at "the end of April" and was only gone for an hour and a half.  Doc. 28 at 5. Whether the time was an hour and a half or four hours is immaterial.  The material fact is that Mr. Aspaas did not follow the proper procedures for requesting leave, emergency or otherwise, on April 23, 2015.  UMF 33.

[11] Mr. Aspaas purports to dispute UMF 33 with the argument on pages 19 to 20 of his brief but does not explain what facts contained on these pages specifically dispute UMF 33.  Doc. 28 at 2. Further, the argument of counsel is not evidence and cannot be used to dispute a material fact. *Fritzsche v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002) ("The argument of counsel is not evidence, and therefore does not provide a proper basis for denying summary judgment.").

36.  Ms. West approved multiple other leave requests, for sick leave and annual leave, between May 6, 2015, and August 10, 2015.  UMF 37.

       3.  *Treatment of Martha Laughter*

During Ms. Laughter's 2015 mid-year review, which occurred on or around July 8, 2015, Mr. Aspaas told his direct report Martha Laughter that she was performing at a "Level 2" (Partially Achieves Expected Results).  UMF 38.  In protest, Ms. Laughter contacted the local union steward, who in turn contacted Mr. Aspaas about that mid-year rating.  *Id.*  After receiving the email from the union steward, Mr. Aspaas emailed several individuals who worked within the Specialty Clinic about Ms. Laughter's performance, stating that he had "rated [Ms. Laughter] at a level 2," and disclosing her purported deficiencies.  UMF 39.  These individuals were outside of Ms. Laughter's chain of command and had no right or need to know of Ms. Laughter's mid-year review assessment.  UMF 40.

One of the bases of Mr. Aspaas's mid-year rating of Ms. Laughter was that she lacked the necessary "certification/licensure."  UMF 41.  During Mr. Aspaas's own mid-year performance review on July 31, 2015, Ms. West discussed with Mr. Aspaas the importance of documentation in his role as Supervisory Clinical Nurse, including ensuring that the registered nurses under his supervision had current licenses and had met yearly competencies.  UMF 42.  On August 12, 2015, about a month after Ms. Laughter's mid-year review by Mr. Aspaas, Dr. Bookwalter asked Mr. Aspaas about the status of Ms. Laughter's certification.[12]  UMF 43.  Two days later, Dr. Bookwalter emailed Mr. Aspaas and then Ms. West, and asked that Ms. Laughter

---

[12] In UMF 43, defendants refer to "Ms. Robertson's licensing/certification."  This is presumably a typographical error as the supporting documentation references "Martha's status."  Doc. 22-21. Ms. Laughter's first name is Martha, and this section of the briefing is discussing Ms. Laughter, not Ms. Robertson.  Doc. 22 at 7–9.

be removed from the podiatry clinic and only return after providing evidence that she held the appropriate licensure or certification.  UMF 44.  Ms. West removed Ms. Laughter from her duties in podiatry and assigned her administrative duties.  UMF 45.

That same day, Ms. West had a discussion with Mr. Aspaas about the issue with Ms. Laughter and his failure to address or document issues.  UMF 46 (Doc. 22-23[13]).  In that discussion, Ms. West informed Mr. Aspaas that he was being temporarily reassigned from the Specialty Clinic and removed from his supervisory role until she completed a review of his actions.  UMF 47.  Ms. West reassigned Mr. Aspaas to the emergency room ("ER") and urgent care departments as a clinical nurse.  UMF 48.  Ms. West notified CEO Ron Tso and the Specialty Clinic staff by email of the reassignment and informed them that she would be acting as the supervisor "until a review of the Specialty Clinic can be completed."  UMF 49.

### 4. *Unsatisfactory Performance of Supervisory Duties*

All supervisors, including Mr. Aspaas, were informed of necessary requirements for personnel files.  UMF 50.  Following his reassignment, Ms. West had Mr. Aspaas's files reviewed, which revealed disorganized and incomplete personnel files for his employees.  UMF 51.  In late August or early September 2015, Ms. West requested access to Mr. Aspaas's computer and work email to see if there was any correspondence showing that he had been communicating with his employees about performance or conduct issues and whether there were any pending patient-care or provider issues that needed attention.  UMF 52.  Because of concerns about his infrequent assistance in the Clinic and computer usage, Ms. West reviewed "web usage reports" to provide insight into what Mr. Aspaas was doing.  UMF 53.

---

[13] Mr. Aspaas objects to the use of defendant's Exhibit 23 (Doc. 22-23) to support UMF 46 and asks the Court to strike the exhibit.  Doc. 28 at 2 n.1.  Exhibit 23 is admissible as a record of a regularly conducted activity.  *See* FED. R. EVID. 803(6).  The Court will not strike Exhibit 23.

5.  *Medical Leave Issue*

After being reassigned, Mr. Aspaas submitted a note from G. Gavin, Physician's Assistant (PA) at the Veteran's Administration clinic in Chinle, Arizona, dated August 20, 2015, which simply stated that Mr. Aspaas had received medical care on August 20, 2015, and should be excused from work from August 20 until September 8, 2015.  UMF 54.  The note recommended that Mr. Aspaas work a different shift upon his return.  *Id.*  On August 21, 2015, Ms. West emailed Mr. Aspaas requesting that before he returned to his duty station, he provide "documentation for the weeks you were on sick leave.  This documentation will need to have medical clearance by your provider."  UMF 55.  That same day, Ms. West approved sick leave for Mr. Aspaas from August 21 through September 8, 2015.  UMF 56.

The defendant's leave policy states that:

> Employees must submit evidence as required by their leave-approving official to support approvals of sick leave.  Officials have the discretion to require different forms of evidence depending upon the circumstances.  For example, a leave-approving official: a. May require medical documentation for extended absences, e.g., over three consecutive work days . . . .

UMF 57 (emphasis in original).  Defendant's leave policy further states in relevant part:

> The purpose of such a requirement is to obtain information that is necessary for planning work or for determining that the approval of continued leave is appropriate (e.g., the health care provider's prognosis of when the employee will be able to return to work; what limitations, if any, the physician will temporarily place on the employee's activities; and, if applicable, what other work the employee could perform).

UMF 58.  Under the defendant's leave policy, "medical documentation" is defined as "that which is signed by the employee's health care provider and is sufficiently specific for the leave approving official to make a reasonable decision that the employee was incapacitated to perform the duties of his/her position."  UMF 59.

On or about September 8, 2015, Mr. Aspaas submitted a form from Ruthie Hunter from "Counseling Services" at CCHCF, which indicated merely that Mr. Aspaas should be excused from work from September 8 to September 18, 2015.  UMF 60.  That same day, Ms. West approved sick leave for Mr. Aspaas for September 8 through September 18, 2015.  UMF 61. Ms. West emailed Mr. Aspaas and again requested medical documentation for the period of his absence, again citing to Agency leave policy.  UMF 62.  From Monday, September 21 through Friday, October 2, 2015, Mr. Aspaas was on previously approved annual leave.  Doc. 63.  On Monday, October 5, 2015, Mr. Aspaas reported back to work in the ER, and Supervisory Clinical Nurse Jim Priest told Mr. Aspaas that he needed to get a medical note that stated that he (Mr. Aspaas) was cleared to return to work.  UMF 64.  Mr. Aspaas then left CCHCF and did not return.  UMF 65.  On or around October 8, 2015, Mr. Aspaas was evaluated by Dr. Sheila Bloomquist, who prepared a note stating only "no work until cleared by MD."  UMF 66.[14]

On October 14, 2015, after Mr. Aspaas had been AWOL for almost two weeks, Ms. West sent him a letter via Certified Mail that summarized his recent failures to follow leave-requesting procedures and instructed him to return to work by October 19, contact her immediately, or

---

[14] Citing Ms. West's testimony, Mr. Aspaas asserts that he disputes UMF 65 because he gave Dr. Bloomquist's note to Ms. West by leaving it at her office at CCHCF, that she understood from the note that he was not to have any work until released by an MD, and that "[h]e would then need to be cleared to come back to work through a writing from a doctor."  Doc. 28 at 9 (Fact YY).  This misconstrues Ms. West's testimony.  Ms. West testified that "Mr. Priest put that document underneath my door. . . ."  Doc. 28-16 at 28 (Tr. at 155:7–10, 17–22).  She further testified that "For all employees, if you're gone for more—if you're on sick leave for more than three days, it's the responsibility of the employee to come back with a medical statement saying it is okay to return back to duty."  *Id*. (Tr. at 155:23–156:4).  Regardless, this testimony does not serve to dispute the fact that Mr. Aspaas left CCHCF on October 5, 2015, and did not return. Even if he was on site at CCHCF to deliver the note, that brief "return" is not material.  What is material is that he did not return to work.

submit his resignation.  UMF 67.[15]  On October 22, 2015, Mr. Aspaas responded that he was still

under "doctor's care" and listed the names and phone numbers of his providers.  UMF 68.  Mr.

Aspaas submitted no leave requests for his absences from October 5, 2015, through at least

December 15, 2015.  UMF 69.[16]  Ms. West charged Plaintiff with AWOL for his absences from

October 5, 2015, through December 15, 2015.  UMF 70.

---

[15] Mr. Aspaas purports to dispute UMF 67 in three ways.  First, he asserts that "the leave policy provides that you must change AWOL to Leave Without Pay ("LWOP") or other status if an explanation is given for the leave."  Doc. 28 at 5 (Fact T, citing Begay-McCabe Depo at 29:18–25).  This is a misstatement of the testimony.  Ms. Begay-McCabe testified that "[i]n cases where there is a leave, an AWOL, and the employee has a reason why they didn't come in, that is a discussion that would be between the supervisor and the employee, and the decision to change an AWOL to leave without pay is up to the supervisor—."  Doc. 28-3 at 10 (Tr. at 29:21–25).  "The decision to change an AWOL to leave without pay is up to the supervisor" is a far cry from a policy that provides that AWOL **must** be changed to leave without pay ("LWOP") if an explanation is given for the leave.  Further, this does not contradict UMF 67.

Second, Mr. Aspaas cites to the testimony of another supervisory nurse, Ms. Malone-Stevens, who expressed her understanding of the policy saying, "[i]f he brought a doctor's statement that he was out, he's not AWOL.  He may be leave without pay.  He's not AWOL."  Doc. 28-8 at 11 (Tr. at 82:22–83:2).  Ms. Malone-Stevens' understanding of the policy does not replace the actual policy, which provides that "[a]n AWOL charge *may* be changed to an appropriate type of leave if the leave-approving official determines that the employee has satisfactorily explained the absence or presented acceptable documentation."  HR Instruction 630-1-30.E.2 (available at https://www.hhs.gov/sites/default/files/hr-resource-library-630-1); *see also* Doc. 38 at 13.  Further, this testimony does not contradict UMF 67.

Third, Mr. Aspaas contends that the Agency "had a policy that veterans getting medical treatment for service[-]connected disabilities like PTSD had a 'right' to leave without pay (LWOP), rather than AWOL."  Doc. 28 at 10 (Fact EEE).  While the policy states that veterans getting medical treatment for service-related disabilities have a right to LWOP, that is irrelevant because Mr. Aspaas provides no evidence that he submitted medical documentation that his absence was because he was receiving "medical treatment for a service-connected disability."  *See* HR Instruction 630-1-30.D.1.a.; *see also* HR Instruction 630-1-50.C.1.a ("Medical documentation is defined as that which is signed by the employee's health care provider and is sufficiently specific for the leave-approving official to make a reasonable decision that the employee was incapacitated to perform the duties of his/her position.").  Further, this policy does not contradict UMF 67.  The Court finds UMF 67 is not genuinely disputed.

[16] Mr. Aspaas purports to dispute UMF 69 by referencing the note from Dr. Bloomquist and his letter of October 22, 2015, insisting he was not AWOL or MIA, but on sick leave.  Doc. 28 at 2.

6. *Removal from Federal Service*

By letter dated December 3, 2015, Ms. West proposed Mr. Aspaas's removal from federal service for Inappropriate Conduct and being AWOL and provided the documentation supporting the proposed action.  UMF 71.  The proposed removal charged Mr. Aspaas with four instances of unacceptable conduct: (1) his failure to handle the certification issues regarding Ms. Laughter; (2) his disclosure of Ms. Laughter's performance rating on July 8, 2015, to individuals without a need to know; (3) his June 9, 2015, email extending an invitation to a job applicant to meet away from the hospital; and (4) his failure to contact Ms. West to request leave from October 5, 2015, to December 3, 2015.  UMF 72.  In his response to the proposed removal, Mr. Aspaas referenced the "doctor's slips" he previously provided to the Agency, but he did not submit any additional medical records or statements by treating healthcare providers to support the need for medical leave.  UMF 73.  By letter dated January 15, 2016, CCHCF CEO Ron Tso issued Mr. Aspaas a Removal Notice in which Mr. Tso sustained both the unacceptable conduct and AWOL charges.  UMF 74.  Mr. Aspaas was separated from federal service effective January 22, 2016.  *Id.*

7. *Facts Related to Retaliation Claim*

On March 26, 2015, Mr. Aspaas claimed that his employee, Ms. Robertson and/or his supervisor, Charlene Ms. West, subjected him to "reverse discrimination" for their response to his denial of Ms. Robertson's request to attend a training based on her pregnancy.  UMF 75.[17]  In

---

Neither of these documents contradict the fact that Mr. Aspaas failed to submit leave requests from October 5, 2015, through at least December 15, 2015.

[17] Mr. Aspaas purports to dispute UMF 75 (Doc. 28 at 2) but offers similar facts describing the incident and asserts that on March 26, 2015, he told Ms. West that he felt he was facing reverse discrimination.  Doc. 28 at 4 (Fact K).  There is no genuine issue as to UMF 75.

early June 2015, Mr. Aspaas met with Jimmy Benally, an EEO counselor.  UMF 76.  Mr. Aspaas

did not tell Mr. Benally at that time that he wanted to file an EEO complaint.  Doc. 22-39 at 2–3

(Tr. at 9:6–10:16).  Mr. Benally[18] did not discuss his meeting with Mr. Aspaas with Ms. West or

Mr. Tso.  UMF 77.[19]  In a July 9, 2015, email, Mr. Aspaas complained to Mr. Tso that he was

denied overtime/compensatory time in May 2015.  UMF 78.  Within that email, Mr. Aspaas

alleged that since April 16, 2015, Ms. West had discriminated against him and harassed him

because of his gender.  *Id.*  Mr. Tso interpreted the single sentence regarding "harassment and

discrimination" in Mr. Aspaas's July 9, 2015, email as being tied to the denial of overtime.

UMF 79[20]; Doc. 22-41 at 3, 5.[21]  Mr. Tso did not discuss the alleged "harassment" with Ms.

West; nor does Ms. West remember him discussing anything with her other than the overtime

issue.  UMF 80.  After Mr. Aspaas was removed as a supervisor, he contacted an EEO counselor,

and an EEO counselor interviewed him on August 26, 2015.  UMF 81.  About a week after

---

[18] UMF 77 states that "Plaintiff did not discuss his meeting with Plaintiff with Ms. West or Mr. Tso," citing to Exhibit 39 (Doc. 22-39 at 4 (Tr. at 11:2–6)).  This is a typographical error.  The supporting transcript makes clear that *Mr. Benally* testified that *he* did not discuss his meeting with Mr. Aspaas with Agency management officials at CCHCF.  *See id.*

[19] Mr. Aspaas purports to dispute UMFs 76 and 77 (Doc. 28 at 2) but offers only details about his conversation with Mr. Benally.  Doc. 28 at 6 (Fact W).  He also asserts that Ms. West did not deny knowing Mr. Aspaas went to the EEO, just didn't recall.  *Id.*  Mr. Aspaas's assertions do not contradict the fact that he met with Mr. Benally, and that Mr. Benally did not discuss this meeting with Ms. West.  *Id.*

[20] Mr. Aspaas purports to dispute UMF 79 with Fact X.  Doc. 28 at 2.  Fact X describes the email he sent to Mr. Tso but does not dispute Mr. Tso's interpretation of it.

[21] Mr. Aspaas objects to the use of defendant's Exhibit 41 (Doc. 22-41) to support UMF 79.  Doc. 28 at 2 n.1.  Exhibit 41 is a signed affidavit, the content and substance of which could be testified to and admissible at trial.  Summary judgment evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  *Brown*, 835 F.3d at 1232.  Further, Rule 56 specifically permits a party to support an asserted fact with affidavits or declarations.  FED. R. CIV. P. 56 (c)(1).  The Court will not strike Exhibit 41.

speaking to the EEO counselor, on August 31, 2015, Mr. Aspaas submitted a letter to Ron Tso,

CEO of CCHCF, with the subject "hostile work environment."  UMF 82.  Ms. West first became

aware of Mr. Aspaas' protected activity on September 3, 2015, when she learned of his EEO

complaint. UMF 83.[22]

---

[22] Mr. Aspaas contends that he disputes UMF 83 with Facts X, Y, and Z.  Doc. 28 at 2.  Fact X
states that Mr. Aspaas wrote a letter to West's boss, Ron Tso about being denied overtime and
being subject to gender discrimination.  Doc. 28 at 6.  There is nothing in Fact X that indicates
that Ms. West became aware of Mr. Aspaas's purported protected activity before September 3,
2015.

Fact Y states that "West told Cindy Norris about this allegation of discrimination/retaliation by
Plaintiff against West around July 9, 2015."  However, the testimony Mr. Aspaas cites from Ms.
Norris does not say that Ms. West told Ms. Norris about an allegation of discrimination or
retaliation as he asserts.  Ms. Norris' testimony was as follows:

> Q: In your statement, it says, "When did you learn about [Mr. Aspaas']
> harassment allegation?"  And your answer, "I think [Ms. West] told me not too
> long after he left.  She said Anthony was complaining that she was harassing
> him."  Is that an accurate statement?
> A: I wrote – I would have – yes, it would have been accurate if . . .
> Q: I mean, your statements in your affidavit were closer to this date –
> A: Well, then, yes.

Doc. 28-9 at 5 (Tr. at 215:15–24).  Ms. Norris' testimony does not indicate that Ms. West told
her about an allegation of discrimination or retaliation, but about "harassing him," which could
mean any number of things and is not necessarily tied to discrimination based on gender or
retaliation for protected activity.  Further, there is no precise date Ms. West spoke to Ms.
Norris—only "not too long after he left"—which would mean sometime after August 14, 2015,
when Ms. West removed Mr. Aspaas as a supervisor of the Specialty Clinic.

Mr. Aspaas asserts that Ms. West "learned she was the target of his discrimination complaint" in
the July 9, 2015, email.  Doc. 28 at 6 (Fact Z).  In the testimony cited in support of Fact Z,
however, nowhere does Ms. West admit that she learned she was the target of a complaint of
discrimination by Mr. Aspaas.  Rather, Ms. West states that she does not recall Mr. Tso
discussing the discrimination allegation with her (Doc. 28-16 at 5 (Tr. at 25:18–26:9); 20 (Tr. at
119:4–120:14)).  Mr. Aspaas also cites to testimony that is discussing a March letter from Mr.
Aspaas, not the July 9, 2015, letter to Mr. Tso.  Doc. 28-16 at 13 (Tr. at 79:10–80:9).  Further,
without any evidentiary support whatsoever, Mr. Aspaas asserts that Ms. West "later admits she
saw the letter."  Doc. 28 at 6 (Fact Z).  The failure to cite to any evidence is contrary to both the
Federal Rules and this district's local rules.  *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that
a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular
parts of material in the record  including depositions, documents, electronically stored

8. *Facts Related to Disability Claim*

Mr. Aspaas was first diagnosed with PTSD on August 20, 2015.  UMF 84.  Prior to his

proposed termination, Mr. Aspaas never told Ms. West of his PTSD diagnosis.  UMF 85.[23]  Mr.

Aspaas alleges that he is completely disabled and unable to perform the essential functions of his

position as a nurse.  UMF 86.[24]

### III.   Defendant's Motion for Summary Judgment and Mr. Aspaas's Response

Defendant moves for summary judgment on all counts of Mr. Aspaas's complaint.  First,

defendant contends that Mr. Aspaas cannot establish that he was discriminated against based on

his gender (Count III).  Doc. 22 at 17–20.  Second, defendant asserts that Mr. Aspaas has not

established that he suffered retaliation for protected activity (Court I).  *Id*. at 25–28.  Third,

defendant argues that he is entitled to summary judgment on Mr. Aspaas's hostile work

environment claim because Mr. Aspaas cannot establish that any harassment was pervasive or

---

information, affidavits or declarations, stipulations (including those made for purposes of the
motion only), admissions, interrogatory answers, or other materials."); D.N.M.LR-Civ. 56.1(b)
(any additional facts asserted in a response to a motion for summary judgment "must refer with
particularity to those portions of the record upon which the non-movant relies").  There is no
genuine dispute of UMF 83.

[23] Mr. Aspaas purports to dispute UMF 85, but none of the additional facts provided by Mr.
Aspaas contradicts that he never told Ms. West of his PTSD diagnosis.  *See* Doc. 28 at 2 (citing
Facts SS, RR, and JJJ), 8–9, 11.  Mr. Aspaas did tell Ms. West about his PTSD in a December
11, 2015, letter responding to the proposal to have him removed.  Doc. 22-37.  There is no
evidence, however, that Mr. Aspaas told Ms. West he was suffering from PTSD prior to
December 2015.  That Mr. Aspaas told Ms. West he was suffering from PTSD after the decision
to remove him is immaterial.  Accordingly, there is no genuine dispute of UMF 85.

[24] Mr. Aspaas purports to dispute UMF 86 by explaining that before he was terminated, he told
Ms. West and Mr. Tso "that he was still under a doctor's care but hoped to return by January
2016."  Doc. 28 at 2, 11 (Fact NNN).  In January 2016, however, he asked to amend his EEO
complaint, stating that "[a]lthough I am not totally disabled physically, [ ] I am considered
disabled mentally because I am unable to render useful and efficient nursing services due to my
recently diagnosed PTSD.  I am unable to perform satisfactorily in any job position [that has a]
'critical element' as a registered nurse on account of my illness and mental injury."  Doc. 22-44.
There is no genuine dispute of UMF 86.

extreme, or that his workplace was "permeated with discriminatory intimidation, ridicule, and insult" that is objectively and subjectively offensive.  *Id.* at 28–31.  Finally, defendant argues he is entitled to summary judgement on Mr. Aspaas's claim for failure to accommodate because he was not medically cleared to work, with or without an accommodation.  *Id*. at 31–35.

Mr. Aspaas responds that defendant's reasons for firing him was pretextual.  Doc. 28 at 11–23.  He argues that there is a causal connection between his "EEO activity" and the action taken by the defendant that demonstrates retaliation.  *Id*. at 23–25.  He contends that the Agency should have accommodated his disability and found a job for him that he could perform.  *Id.* at 25–28.  Mr. Aspaas also argues that the change in his work schedule was disparate treatment based on his gender.  *Id*. at 29.  Mr. Aspaas further contends that the reasons for his termination were pretextual, that he was not AWOL but provided notes from his doctors stating that he could not return to work until he was medically cleared, and that he was not required to provide a diagnosis or a medical condition.  *Id.* at 30–31.  Mr. Aspaas asserts that he was entitled to LWOP instead of AWOL because he was a veteran and experienced a trigger for his PTSD.  *Id.* at 31.  Finally, Mr. Aspaas argues that he reported "reverse discrimination" and retaliation to Ms. West, her boss Mr. Tso, and an EEO counselor, that these reports were protected activity, and that Ms. West and the Agency retaliated against him for this activity.  *Id*. at 37.

## IV.   Discussion

### A.   Title VII

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  The language of Title VII is not limited to

economic or tangible discrimination but applies to the entire spectrum of disparate treatment in employment, including "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993). Thus, a plaintiff can prove discrimination in several different ways, including proof of disparate treatment or a hostile work environment. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). In this case, Mr. Aspaas has alleged both disparate treatment and a hostile work environment based on his gender. *See* Doc. 1 ¶¶ 20–28, 35–37, 42–48, 50, 52, 66, 67, 95–97.

### B. Burden-Shifting Framework

When assessing a motion for summary judgment in the Title VII context, the Court applies the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021). The *McDonnell Douglas* framework comprises three burden-shifting steps. Initially, the burden rests with the plaintiff to establish a prima facie case of gender discrimination. *McDonnell Douglas*, 411 U.S. at 802. Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *Id*. Finally, if the defendant articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show the proffered reason is merely a pretext for gender discrimination. *Id*. at 804. Where the parties have satisfied their respective burdens under the *McDonnell Douglas* framework, summary judgment is ordinarily inappropriate. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 148 (2000).

### C. Mr. Aspaas Has Not Established a Prima Facie Case of Intentional Discrimination Based on his Gender (Count III).

Mr. Aspaas alleges that the following adverse employment actions were discriminatory: (1) his removal from his supervisory position and reassignment to the emergency room; (2) his

absences being charged as AWOL; and (3) his termination.  Under the *McDonnell Douglas* approach, Mr. Aspaas first must make out a prima facie case of discrimination, which requires that he show that "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated [or suffered some other adverse employment action] under circumstances giving rise to an inference of discrimination." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).  Defendant argues that Mr. Aspaas cannot meet the second and third elements of a prima facie case.  Doc. 22 at 18–20.  I agree.

1. *Mr. Aspaas has not shown that he was satisfactorily performing his job.*

Mr. Aspaas was the subject of progressive discipline prior to his removal from his supervisory position.  In April 2015, Mr. Aspaas was counseled for (1) calling a health technician an "idiot" who did not know what she was doing in front of other staff members; (2) not being on the floor of the specialty clinic enough; (3) denying Ms. Robertson a training opportunity because she was pregnant and then retaliating against her; (3) changing his staff's schedule for purported abuses that he had not properly documented; and (5) emailing other supervisors in the hospital with undocumented complaints about his staff.  Doc. 22-5.  Written warnings were placed in Mr. Aspaas's file to "begin progressive disciplinary action" for the incidents with the healthcare technician and Ms. Robertson.  Doc. 22-13.  A couple of weeks later, Mr. Aspaas again was written up for being AWOL on two separate days in April.  Doc. 22-16.  The memorandum charging Mr. Aspaas with AWOL warns that "[t]his charge of AWOL is not a disciplinary action.  However, any absence from duty without approved leave may be cause for disciplinary action to be taken.  Such action may include a letter of reprimand, suspension and even removal from the Federal service."  *Id.* at 2.

In July of 2015, Mr. Aspaas gave Ms. Laughter a low mid-year performance rating, then disclosed that rating along with her purported deficiencies to several individuals within the Specialty Clinic who were outside of her chain of command and had no right or need to know of her mid-year review assessment.  UMFs 39, 40.  One of the reasons for the rating was that Ms. Laughter lacked the necessary certification or licensure.  UMF 41.  On July 31, 2015, during Mr. Aspaas's own mid-year review, Ms. West discussed with him the importance of ensuring that the registered nurses under his supervision had current licenses and had met yearly competencies.  UMF 42.  Approximately two weeks after this discussion, a doctor asked Mr. Aspaas about the status of Ms. Laughter's certification, then asked that she be removed from the podiatry clinic until she could provide evidence that she held the proper certification.  UMFs 43–44.  Mr. Aspaas did not take any action with respect to Ms. Laughter, and Ms. West removed Ms. Laughter from her podiatry duties herself.[25]  UMF 45.  On August 14, 2015, Ms. West advised Mr. Aspaas that he was being temporarily reassigned from the Specialty Clinic and removed from his supervisory role until she completed a review of his actions.  UMF 47.  Mr. Aspaas was reassigned to the ER and urgent care as a clinical nurse.  UMF 48.  The evidence shows that Mr. Aspaas was not satisfactorily performing his duties as a supervisory clinical nurse when he was reassigned.  After his reassignment, Ms. Aspaas was mostly absent from work until his termination in January of 2016.  *See* UMFs 54–74.  During his absence, he never

---

[25] Mr. Aspaas asserts in his response that "certification wasn't even required."  Doc. 28 at 18. Nonetheless, he argues that he tried to help Ms. Laughter with the certification "by giving her forms and even offering to pay for it."  *Id.* at 19.  When she failed to complete certification, Mr. Aspaas informed the doctor she worked for that she was not certified, and the doctor made the decision that Ms. Laughter could not work in the clinic until certified.  *Id.*  Mr. Aspaas's attempt to excuse his behavior by suggesting that certification was not required makes no sense.  Mr. Aspaas brought the lack of certification to the attention of not only the doctor Ms. Laughter was working with, but to several other employees in the Specialty Clinic, and gave her a low mid-year rating based on her lack of a certification.  *See* Doc. 22-17.

provided adequate medical documentation to support his sick leave requests, and he never

requested leave at all from October 5, 2015, to December 15, 2015. *See id.*

Mr. Aspaas asserts that "[p]erfomance as a supervisor is a red herring as the agency and

officials all state that it was a misconduct removal, not performance."[26]  Doc. 28 at 14.  This,

however, misunderstands the *McDonald Douglas* framework.  To make out a prima facie case of

gender discrimination, Mr. Aspaas bears the burden of showing that he was performing his job

satisfactorily.  *See Barlow*, 703 F.3d at 505.  If he cannot do so, he cannot show that he was

discriminated against.  *See, e.g.*, *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907 (7th Cir.

2010) (holding that if district court was correct in determining that plaintiff could not establish a

prima facie case of discrimination, the plaintiff could not succeed on appeal); *Rosenthal v.*

*Faygo Beverages, Inc.*, 701 F. App'x 472, 476 (6th Cir. 2017) (explaining that district court

could *assume* that plaintiff established a prima facie case of discrimination, move past that

analytical step, and decide that summary judgment should be granted to defendant because

defendant had established a non-discriminatory reason to terminate the plaintiff and the plaintiff

failed to establish pretext); *Richardson v. First Citizens Bank & Trust Co.*, 149 F.3d 1170

(Table), 1998 WL 352912, *2 (4th Cir. 1998) (unpublished) (finding that plaintiff could not

prove she was performing her job responsibilities at a satisfactory level).

---

[26] Unfortunately, Mr. Aspaas does not address the issues raised in defendant's Motion for
Summary Judgment directly, but instead makes various arguments in a seemingly random order.
*See* Doc. 28 at 11–37.  For example, rather than first address whether Mr. Aspaas can make out a
prima facie case of discrimination—as the defendant does—Mr. Aspaas begins his argument by
attempting to show that all the reasons given for the adverse employment actions were
pretextual.  *See id.* at 11–21.  Of course, whether Mr. Aspaas can show that the reasons given for
the adverse employment action are pretextual is the last aspect of the *McDonald Douglas*
analysis, not the first.  The Court is doing its best to understand Mr. Aspaas's arguments as they
pertain to the relevant issues.

Although Mr. Aspaas calls his performance issues a "red herring," he asserts that he was performing satisfactorily because "[a]ll objective written indicators found him between 'acceptable' and 'outstanding[,]' and at the time of the removal he had no prior disciplinary actions or progressive discipline." Doc. 28 at 14. In support of this argument, Mr. Aspaas points to a performance evaluation from January 2014 that stated he was performing well. *See* Doc. 28 at 14–15 (citing to Doc. 28-2 at 3 (Oct. 6, 2020 Tr. at 145:22–146:24)). But a performance evaluation from January 2014 does not demonstrate that Mr. Aspaas was satisfactorily performing his job in August 2015, when he was reassigned. Mr. Aspaas also relies on testimony from a subordinate in which the subordinate stated that she is where she is because Mr. Aspaas and others kept encouraging her. Doc 28 at 15 (citing to Doc. 28-15 at 3 (Tr. at 217:20–24)). This has no bearing on whether Mr. Aspaas was satisfactorily performing his job.

Mr. Aspaas also suggests that it was Ms. West who was a poor communicator and a poor supervisor, not Mr. Aspaas. *See* Doc. 28 at 15. But again, whether Ms. West was performing her job satisfactorily is irrelevant; Mr. Aspaas must show that he was performing his job in a satisfactory manner.

Mr. Aspaas presents some evidence that he got along well with his staff, Doc. 28-8 at 2 (Tr. at 31:21–32:11), Doc. 28-17 at 2 (Tr. at 178:10–179:1), that he sometimes helped out in other clinics, Doc. 28-8 at 2 (Tr. at 32:12–23), and that he was "out on the floor about, maybe, 25 percent" of the time, Doc. 28-17 at 4 (Tr. at 186:9–10). This, however, does not address at all the defendant's evidence that Mr. Aspaas had failed in his supervisory role with respect to several employees, and that he was AWOL for an extended period. Mr. Aspaas has not shown

that he was satisfactorily performing his duties when he was reassigned or when he was
terminated.

    2.  *Mr. Aspaas has not shown that he suffered an adverse employment action under circumstances giving rise to an inference of gender discrimination.*

Even if Mr. Aspaas could establish that he was performing his job satisfactorily, he
cannot show that he suffered an adverse employment action under circumstances giving rise to
an inference of gender discrimination.  A plaintiff can establish an inference of discrimination
"in various ways, such as actions or remarks made by decisionmakers, preferential treatment
given to employees outside the protected class, or more generally, upon the timing or sequence
of events leading to plaintiff's termination."  *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505
(10th Cir. 2012) (internal quotations omitted).  Here, there is no evidence that defendant took
any adverse employment action against Mr. Aspaas because he was a man.  There is no evidence
that Ms. West made insensitive comments about Mr. Aspaas or about men in general, nor has
Mr. Aspaas shown that Ms. West gave women preferential treatment, nor was there anything
about the timing or sequence of events that leads to the inference that Mr. Aspaas was
reassigned, charged with AWOL, or terminated because he was a man.

Mr. Aspaas claims that two pieces of evidence lead to the inference that adverse
employment actions were taken against him because he was a man.  *See* Doc. 28 at 29.  First, he
argues that Ms. West "drew inappropriate stereotypes about him as a male Vietnam Veteran,"
that "she called the police to be present while dealing with him twice, but that females did not
have the same treatment."  *Id.*  Second, he contends that Ms. West changed his work schedule to
five days from four days, and that none of the other supervisors—who were women—had their
schedules changed, and that "[o]ther female supervisors were sent for supervisory training if

there were issues with their handling of employees, but not this male employee." *Id.* The evidence that Mr. Aspaas points to does not support an inference of gender discrimination.

With respect to the allegation that Ms. West "called the police" to be present while she spoke to Mr. Aspaas, this is a misrepresentation of the evidence. The record is clear that Ms. West twice requested that security be present outside the door when she spoke to Mr. Aspaas, not police officers. *See* Doc. 28-2 at 6 (Oct. 6, 2020 Tr. At 164:22–24); Doc. 28-19 at 4 ("I had security in case anything happened because I did not know how he would react."). Further, Ms. West's statements make clear that she asked security to be present because she knew that Mr. Aspaas was angry with her, and she didn't know how he would react. *See* Doc. 22-3 at 5 ("I actually am fearful of him because he is a big man and since I am female I wasn't comfortable being by myself."); Doc. 28-19 at 4 (Ms. West explaining that she had security present because she did not know how Mr. Aspaas would react); Doc. 28-9 at 2 (Tr. At 183:16–17) (Ms. Norris testifying that Ms. West "was afraid of him because of his anger"), (Tr. At 183:23–24) ("She was afraid of him. She was afraid of what he might do because he was—she knew he was angry at [her]."). This evidence does not show that Ms. West had any animosity toward Mr. Aspaas because he was a man; she was afraid of him because he was angry, he was bigger than her, and she was afraid of what he might do.

Further, although Mr. Aspaas alleges that other similarly situated female employees were treated more favorably than he was, *see* Doc. 28 at 29, he does not identify those females, nor does he identify other female employees who engaged in similar misconduct who were not disciplined or terminated. To establish a claim of disparate treatment, Mr. Aspaas is required to identify other similarly situated employees who were treated more favorably than he was after violating work rules of comparable seriousness. *See Aramburu v. Boeing Co.*, 112 F.3d 1398,

1404 (10th Cir. 1997).  The only evidence that Mr. Aspaas relies on to support his disparate treatment claim is his own testimony that when he changed the schedules of employees he supervised for purported leave issues, Ms. West changed his schedule to match those of his employees.  *See* UMFs 20–22, 25.  Mr. Aspaas testified that he was the only supervisor whose schedule was changed, and that all the other supervisors were women, but he does not identify the other supervisors, nor does he show that they also violated work rules of comparable seriousness.  *See* Doc. 28-2 at 5 (Oct. 6, 2020 Tr. At 158:22–159:13).  This evidence does not support an inference that Ms. West was biased against Mr. Aspaas because he was a man, nor is it sufficient to support a disparate treatment claim.

Mr. Aspaas also alleges that female supervisors were permitted to go to training if they needed improvement, but he was not given that option.  Doc. 28 at 29.  Mr. Aspaas cites to testimony by Ms. Norris to support this allegation.  *See id.*  Ms. Norris testified that there were two trainings for supervisors that Ms. West wanted all her supervisors to go to, but that they were only offered at specific times, and Ms. Norris herself did not go her first year either.  Doc. 28-9 at 7 (Tr. At 225:9–226:6).  This evidence does not support Mr. Aspaas's allegation of disparate treatment or show that Ms. West was biased against men.  Mr. Aspaas has not established a prima facie case of gender discrimination.

      3.   *The Agency articulated legitimate, non-discriminatory reasons for its employment decisions, and Mr. Aspaas cannot show that these reasons are pretextual*.

Even if Mr. Aspaas could establish a prima facie case of gender discrimination, the Agency has articulated legitimate, non-discriminatory reasons for its actions, and Mr. Aspaas cannot show that these reasons are pretextual.

a. *Removal as a Supervisor*

The evidence shows that Ms. West removed Mr. Aspaas from his duties as a supervisor because he failed to deal with Dr. Bookwalter's concerns that one of the employees whom Mr. Aspaas supervised, Martha Laughter, did not have the appropriate certifications to work in the podiatry clinic. *See* UMFs 38-49. Ms. West ended up having to reassign Ms. Laughter herself, and in doing so she learned that Mr. Aspaas had not done anything to help Ms. Laughter make sure she had the proper certifications, *see* Doc. 22-22, despite Ms. West having told Mr. Aspaas two weeks earlier that he was responsible for making sure that his staff had current licenses and met their yearly competencies, *see* Doc. 22-20. In other words, the defendant has articulated legitimate, non-discriminatory reasons for removing Mr. Aspaas as a supervisor, and Mr. Aspaas has not shown that these reasons are pretextual.

b. *Absences Without Requesting Leave*

The Agency's leave policy states:

Employees must submit evidence as required by their leave-approving official to support approvals of sick leave. Officials have the discretion to require different forms of evidence depending upon the circumstances. For example, a leave-approving official:

a. May require medical documentation for extended absences, e.g., over three consecutive work days . . . . Medical documentation is defined as that which is signed by the employee's health care provider and is sufficiently specific for the leave-approving official to make a reasonable decision that the employee was incapacitated to perform the duties of his/her position.

UMFs 57, 59. The leave policy explains that:

The propose of such a requirement is to obtain information that is necessary for planning work or for determining that the approval of continued leave is appropriate (e.g., the health care provider's prognosis of when the employee will be able to return to work; what limitations, if any, the physician will temporarily place on the employee's activities; and, if applicable, what other work the employee could perform).

UMF 58.

The undisputed facts show that Mr. Aspaas failed to abide by the leave policy and procedures.  In April 2015, Mr. Aspaas was charged with six hours of AWOL for failing to follow the Agency's procedures for requesting leave on two different days.  *See* UMF 36.

Shortly after Mr. Aspaas was removed as a supervisor, he stopped reporting for work but continued to fail to comply with the Agency's leave policies.  Mr. Aspaas submitted a note dated August 20, 2015, that stated that he had received medical care on that day and should be excused from work until September 8, 2015.  UMF 54.  Ms. West sought further documentation from Mr. Aspaas for the weeks he was on sick leave.  UMF 55.  Despite not receiving additional information, Ms. West approved sick leave for Mr. Aspaas through September 8, 2015.  UMF 56.  The day he was scheduled to return, on September 8, 2015, Mr. Aspaas submitted a form from his healthcare provider that stated that he should be excused from work from September 8 to September 18, 2015.  UMF 60.  There was no other information about why Mr. Aspaas needed to be excused in that note.  Doc. 22-30.  Ms. West again approved the leave for Mr. Aspaas through September 18, 2015.  UMF 61.  Notwithstanding her approval, Ms. West again asked Mr. Aspaas to provide medical documentation for the period of his absence but received none.  *See* UMF 62.

Mr. Aspaas had previously-approved annual leave from Monday, September 21 through October 2, 2015.  UMF 63.  Mr. Aspaas reported to work on October 5, 2015, in the ER, but the supervisory clinical nurse, Jim Priest, told Mr. Aspaas that he needed to get a medical note that stated he was cleared to return to work.  UMF 64.  Mr. Aspaas left and did not return to work at CCHCF.  UMF 65.  Later that week, on October 8, 2015, Mr. Aspaas was evaluated by Dr. Bloomquist who prepared a note stating only "no work until cleared by MD."  UMF 66.  By

October 14, 2015, having failed to follow the leave procedures, Mr. Aspaas had been AWOL for two weeks.  UMF 67.  Ms. West sent Mr. Aspaas a letter via Certified Mail that summarized his recent failures to follow leave-requesting procedures, instructed him to return to work by October 19, contact her, or submit his resignation.  UMF 67.  Mr. Aspaas did none of these things and did nothing to remedy his failure to follow the leave procedures.  Instead, Mr. Aspaas responded that he was still under a doctor's care.  UMF 68.  Mr. Aspaas did not submit leave requests for his absences from October 5, 2015, through December 15, 2015, and Ms. West charged him with AWOL for this entire period.  UMFs 69, 70.

There is no evidence that Ms. West charged Mr. Aspaas with AWOL because he is a man.  Mr. Aspaas failed to follow the appropriate procedures for requesting an extended leave and failed to provide Ms. West with a satisfactory explanation for the need for such extended leave.  Although Ms. West granted Mr. Aspaas leave for a while and gave him an opportunity to comply with her requests, he never complied.  Mr. Aspaas does not identify any female employee who failed to follow the leave-requesting procedures and was not charged with AWOL.  Mr. Aspaas does not submit sufficient evidence to support a reasonable probability, that but for his status as a man, he would not have been charged with AWOL from October 5, 2015, through December 15, 2015.  The Agency has articulated legitimate, non-discriminatory reasons for adhering to its leave policy and charging Mr. Aspaas with AWOL.  Mr. Aspaas cannot show that these reasons are pretextual.

c.  *Termination*

Given Mr. Aspaas's failure to fulfill his supervisory duties, and because he was AWOL for three months, on December 3, 2015, Ms. West proposed that Mr. Aspaas be removed from federal service.  UMF 71.  The proposed removal gave four reasons for his termination:  (1) his

failure to handle the certification issues regarding Ms. Laughter; (2) his disclosure of Ms. Laughter's performance rating on July 8, 2015; (3) his June 9, 2015, email extending an invitation to a job applicant to meet away from the hospital; and (4) his failure to contact Ms. West to request leave from October 5, 2015, to December 3, 2015.  UMF 72.  After giving Mr. Aspaas an opportunity to respond, Mr. Tso considered Ms. West's proposal and concluded that removal was reasonable.  *See* UMF 74.  Mr. Aspaas was separated from federal service effective January 22, 2016.  *Id.*

The only reason given for Mr. Aspaas's termination that the Court has not already discussed is Mr. Aspaas's June 9, 2015, email extending an invitation to a job applicant to meet away from the hospital.  Mr. Aspaas argues that he never met with the job applicant, and asserts that this "erroneous charge is strong evidence of an improper motivation."  Doc. 28 at 12.  Once again, counsel has misinterpreted the evidence.  There is no dispute that Mr. Aspaas did not ***meet*** with the job applicant, and Ms. West did not charge him with actually meeting with her.  Rather, Ms. West charged him for ***inviting*** her to meet outside of the hospital.  Doc. 22-36 at 1.  The invitation itself was considered inappropriate.  There is no indication that the charge of inviting an applicant to meet away from the hospital had anything to do with Mr. Aspaas being a man.  Ms. West testified that as the "selecting official" it was "professional etiquette for any of the applicants, all of the supervisors interviewed in here within [CCHCF], and it's a formal interview.  If we can't interview them in person, we can interview them by telephone, but it's inappropriate to meet someone outside of work to communicate to them about a potential hiring to a position here at CCHCF."  Doc. 28-16 at 10 (Tr. At 60:4–18).  Ms. West could not think of any legitimate business-related reason for Mr. Aspaas to meet with a job candidate outside of the workplace.  *Id*. (Tr. At 60:19–22).

To show that the reasons given for his removal were pretextual, Mr. Aspaas must submit evidence more than mere conjecture that the reasons were pretextual. *See Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011). He must show pretext "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (internal quotation marks omitted). Mr. Aspaas utterly fails to meet this standard.

Regarding the invitation to meet the applicant outside of work, Mr. Aspaas appears to argue that Ms. West got it wrong: that the job candidate was not seeking a job in Mr. Aspaas's department but was seeking a job in a different area. *See* Doc. 28 at 12–13. He relies on emails that purportedly were in Ms. West's possession when she proposed removing Mr. Aspaas, but he does not include the emails with his response. *See id.* Further, in his response to his proposed removal, Mr. Aspaas only denies that he met with the job candidate; he does not deny that she was a job candidate, and he does not deny that he invited her to meet with him offsite. *See* Doc. 22-37 at 1. Mr. Aspaas has not shown that this reason is pretextual.

Regarding Ms. Laughter's certification, Mr. Aspaas inconsistently argues both that certification was not necessary, Doc. 28 at 18, and that he tried to help Ms. Laughter with her certification, *id.* at 19. He further argues that the fact that he was removed as a supervisor the same day that the doctor requested that Ms. Laughter be reassigned shows that the reason given was pretextual because the action was so swift. *Id.* at 18–19. But Mr. Aspaas overlooks the fuller picture. Mr. Aspaas was removed as a supervisor on August 14, 2015. Doc. 22-23. More than a month before he was removed as a supervisor, Mr. Aspaas wrote in an email that he had

given Ms. Laughter a low rating in part because she lacked the necessary certifications.  Doc. 22-17.  At his mid-year review at the end of July 2015, Ms. West asked him to work directly with his staff to rectify issues as they arose, and to make sure that he documented the steps he took.  Docs. 22-20, 22-23.  On August 12, 2015, the doctor in charge of the podiatry clinic asked Mr. Aspaas about the status of Ms. Laughter's certification because without the proper certification, she was not permitted to treat patients.  Doc. 22-21 at 1.  On August 14, 2015, the doctor sent an email to Mr. Aspaas and Ms. West, insisting that Ms. Laughter be removed from the podiatry clinic until she had the appropriate certification.  *Id.* at 2.  At that point, Ms. West herself informed Ms. Laughter that she could not work in the podiatry clinic without the proper certification, Doc. 22-22, and she removed Mr. Aspaas from his supervisory duties because he had not communicated with Ms. Laughter regarding her lack of certification, Doc. 22-23.  Mr. Aspaas has not shown that this reason is pretextual.

Regarding the disclosure of Ms. Laughter's performance rating to other employees, Mr. Aspaas argues that he did not think he was giving out private information because Ms. Laughter already had shared her rating with other people in the department.  Doc. 28 at 20–21.  He also argues that "[s]haring confidential was tolerated on site, as West herself gave out [his] private leave status telling others that [he] was 'AWOL or MIA.'"  *Id.* at 21.  In support of his allegation that sharing confidential information was tolerated, he cites only to his earlier accusation that Ms. West told others that he was AWOL or MIA.  *See id.* (citing Doc. 22-37).  He provides no evidence from others that they heard this information from Ms. West, nor does he provide any evidentiary support for the suggestion that sharing confidential information was widely accepted.  Mr. Aspaas has not shown that this reason is pretextual.

Regarding being charged with AWOL, Mr. Aspaas essentially argues that he provided sufficient information to Ms. West and others that his failure to follow the Agency's leave procedures should have been excused, or at least someone should have called him to help him comply with the required procedures.  Doc. 28 at 30–31.  He also argues that employees are not required to state the reason they are seeking sick leave, and that it is illegal to ask an employee for a diagnosis.  *Id.* at 31.  Mr. Aspaas, however, does not cite any legal authority that would support his argument that the Agency's leave policy is illegal.  *See id.* at 31–32.  Given Mr. Aspaas's weeks of absences, the Agency had a legitimate, non-discriminatory reason to require that Mr. Aspaas provide documentation, signed by his health care provider, that was sufficiently specific for Ms. West to make a reasonable decision about Mr. Aspaas's ability to perform his position given his medical condition.  Mr. Aspaas has not shown that this reason is pretextual.

Mr. Aspaas also argues that he was entitled to LWOP for his absences, which shows that his AWOL status was another pretext for terminating his employment.  *See id.*at 31.  Mr. Aspaas claims that he was entitled to LWOP by virtue of his August 16, 2015, memo to Ron Tso, in which he claimed, among other things, that he was a veteran "suffering from PTSD," and that he "gave up working in the ER many years ago due to bloody trauma started triggering my PTSD."  Doc. 22-43 at 2.  This simply ignores the policy that LWOP is only required when "[a]n employee, who is a disabled veteran, presents an official statement from a medical authority that medical treatment is required in connection with the disability," and that the "employee must give prior notice of the period during which absence for treatment will occur."  HR Instruction 630-1-30.B.1.a (available at https://www.hhs.gov/about/agencies/asa/ohr/hr-library/index.html). There is no evidence that Mr. Aspaas complied with the requirements for receiving LWOP.

Thus, his failure to receive LWOP instead of being charged with AWOL does not show that that his AWOL status was a pretextual reason for his termination.

Mr. Aspaas further argues that the Agency ignored its own leave policies, which shows that his AWOL status was a pretext to terminating him.  *See* Doc. 28 at 32–33.  He points to a provision that states, "An AWOL charge *may* be changed to an appropriate type of leave if the leave-approving official determines that the employee has satisfactorily explained the absence or presented acceptable documentation."  *See id.* at 32 (emphasis added) (referring to HR Instruction 630-1-30.E.2 (available at https://www.hhs.gov/about/agencies/asa/ohr/hr-library/index.html)).  Here, there is no dispute that the leave-approving official was Ms. West, and that she had discretion to require "acceptable documentation" if she did not believe that Mr. Aspaas had satisfactorily explained his weeks of absences.  There is no evidence that Ms. West did not comply with the Agency's leave policy.  Further, the contention that requiring documentation would be illegal is without merit.  The Health Insurance Portability and Accountability Act (HIPAA) does not prohibit an individual from disclosing his or her own medical information.  *See Murphy v. Dulay*. 768 F.3d 1360, 1373 (11th Cir. 2014) ("Under HIPAA an individual may disclose his entire medical history for any purpose.").  Nor does HIPAA or any other law prohibit an employer from requiring medical documentation for leave purposes.  *See, e.g.*, *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008–09 (10th Cir. 2011) ("[A]n employer generally does not violate the [Family Medical Leave Act] if it terminates an employee for failing to comply with a policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA.*") (emphasis in original); *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 258 (6th Cir. 2011) ("[T]he City's Directive [requiring doctor's note for sick leave of more than three days] comports with the Rehabilitation Act and

does not violate the proscriptions pertaining to disability-related inquiries set forth in

§ 12112(d)(4)(A) of the ADA."). Mr. Aspaas cannot show that the reasons for his termination

were pretextual.

### D. Mr. Aspaas Cannot Establish a Prima Facie Case for Hostile Work Environment Based on his Gender.

Although not set out in a separate count, Mr. Aspaas suggests in his complaint that he

experienced a hostile work environment in retaliation for his protected activity and also because

of his gender. *See* Doc. 1. Mr. Aspaas's complaint and response make clear that in his view, the

one person who created the alleged hostile work environment was Ms. West. *See generally id.*;

Doc. 28. Because the undisputed facts show that Ms. West did not become aware of Mr.

Aspaas's protected activity until September 3, 2015, and because Mr. Aspaas was either on some

sort of leave status or AWOL from August 20, 2015, until his termination, Mr. Aspaas cannot

establish a hostile work environment based on retaliation for his protected activity. As a result,

the Court focuses on Mr. Aspaas's gender-based hostile work environment claim.

Although hostile work environment is not explicitly mentioned in Title VII, it is well

established that a victim of a hostile or abusive work environment may bring a cause of action

pursuant to 42 U.S.C. § 2000e–2(a)(1). *Bolden v. PRC Inc*., 43 F.3d 545, 550 (10th Cir. 1994).

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986), the Supreme Court held that "a

plaintiff may establish a violation of Title VII by proving that discrimination based on sex has

created a hostile or abusive work environment." However, not all harassment creates a hostile

work environment; the harassment must be "sufficiently severe or pervasive to alter the

conditions of [the victim's] employment." *Id*. at 67 (internal quotation marks omitted)

(alteration in original). Severity and pervasiveness are evaluated according to the totality of the

circumstances, *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993), considering such factors as

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *O'Shea v. Yellow Technology Services, Inc*., 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Harris*, 510 U.S. at 23).

But severity and pervasiveness are not enough. The "plaintiff must produce evidence that [he] was the object of harassment *because of [his] gender*." *Penry,* 155 F.3d at 1261 (emphasis added). Title VII is not a code of workplace conduct, nor was it "designed to bring about a magical transformation in the social mores of American workers." *Gross,* 53 F.3d at 1538. Title VII targets discrimination. "To sustain a claim of hostile work environment under Title VII, a plaintiff must show (1) that [he] was discriminated against because of [his] sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of [his] employment and created an abusive working environment." *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (internal quotations and citation omitted). To show harassment was because of his sex, Mr. Aspaas may cite "acts of harassment that are either facially sex based or facially sex neutral if context indicates that acts that may appear neutral in isolation could be understood by a jury to part of an overall animus and pattern of sexual discrimination and harassment." *Id.* Mr. Aspaas has not produced sufficient evidence showing that he was the object of harassment because of his sex, or that any harassment was sufficiently severe or pervasive that it altered the conditions of his employment.

Mr. Aspaas does not specifically address the elements of his hostile work environment claims in his response; instead, he complains throughout his response that Ms. West mistreated him. *See* Doc. 28. This makes it difficult for the Court to assess exactly what evidence Mr.

Aspaas believes supports his hostile work environment claims, or whether he is even bringing these claims. Assuming Mr. Aspaas is bringing hostile work environment claims (based either on his gender or in retaliation for his protected activity), the Court addresses what appear to be Mr. Aspaas's main complaints about Ms. West's treatment of him.

As discussed above, Mr. Aspaas makes much of Ms. West's request that security—he calls them "police"—stand outside the door when she spoke to Mr. Aspaas in both April and August 2015. *See* Doc. 28 at 22, 24, 29. Although Mr. Aspaas claims that Ms. West called security because he was a man, the evidence shows that she called security because she knew Mr. Aspaas was angry with her, and she did not know how he would react to their meetings. Further, even if this somehow was a form of "harassment," these two isolated incidents months apart were not pervasive enough to create a hostile work environment.

Mr. Aspaas also contends that at his August 2015 meeting with Ms. West, she called him a "mean person" who would get what he deserved, and that she would treat him like he treated Ms. Laughter. She also called him a "loser." Doc. 28 at 7 (Fact JJ). According to Mr. Aspaas, Ms. West was angry, yelling and shaking her finger at him. *Id*. She stated that she was sorry she ever hired him and that he did not know anything about being a supervisor. *Id*. Even if these comments are true, there is no evidence that Ms. West made these comments because Mr. Aspaas is a man. And again, this one incident was not pervasive enough to create a hostile work environment.

Mr. Aspaas also claims that Ms. West changed his work schedule from four days a week to five, and that he was the only supervisor who was "forced to work an extra day"—all the other supervisors were women. Doc. 28 at 29. He also alleges that other female supervisors who had "issues with their handling of employees" were sent for supervisory training, but he

was not. *Id.* Neither of these events were facially sex-based, nor were they "harassing." Ms. West changed Mr. Aspaas's work schedule to match those of his supervisees, which Mr. Aspaas had changed based on what he viewed as abuses of the alternative work schedules. UMFs 20–22. There is no evidence that this work schedule change was based on his sex. Regarding training for supervisors, the testimony relied on by Mr. Aspaas indicated that Ms. West wanted all her supervisors to go to the training, but it was only offered once a year, and it was not always easy to schedule the training. *See* Doc. 28-9 at 7 (Tr. At 225:9–226:7). This does not support an inference that Mr. Aspaas was denied training because he was a man.

Because Mr. Aspaas does not present any evidence that Ms. West's alleged harassment of him was based on his gender, and because the alleged harassment was not sufficiently severe or pervasive to create an abusive working environment, Mr. Aspaas fails to state a prima facie hostile work environment claim based on gender. Defendant is entitled to judgment as a matter of law on Mr. Aspaas's hostile work environment claim.

  E. <u>Mr. Aspaas Cannot Establish a Prima Facie Case of Retaliation (Count I)</u>.

In count I of his complaint, Mr. Aspaas claims that he was subjected to retaliation for engaging in protected activity. Doc. 1 ¶¶ 84–85. Title VII makes it unlawful to retaliate against an employee for opposing any practices that the statute makes unlawful. 42 U.S.C. § 2000e–3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). This burden may be satisfied in one of two ways. Under the direct or "mixed motives" approach, a plaintiff may offer direct evidence that retaliation played a "motivating part" in the adverse employment decision. *Id*. at 1225. If the plaintiff can prove that retaliatory animus was a motivating factor, the burden then shifts to the employer to demonstrate that it would have

taken the same action absent the retaliatory motive. *Id.*

Alternatively, in the absence of direct evidence, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, Mr. Aspaas first must establish a prima facie case of retaliation by showing (1) "that he engaged in protected opposition to discrimination," (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007). To establish the requisite causal connection between his protected conduct and his termination, Mr. Aspaas must show that a desire to retaliate against him for his protected activity motivated the Agency to terminate him or otherwise take adverse action against him. *See Wells v. Colo. Dep't of Transp*., 325 F.3d 1205, 1218 (10th Cir. 2003). As a prerequisite to this showing, Mr. Aspaas must come forward with evidence from which a reasonable factfinder could conclude that those who decided to take a materially adverse action against him had knowledge of his protected activity. *See Montes v. Vail Clinic, Inc*., 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [him or her] knew of the employee's protected activity." (quotation omitted)).

"Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1234 (10th Cir. 2015) (internal quotation marks, ellipses, and citation omitted). As the Tenth Circuit has explained, "[p]retext can be inferred from evidence revealing 'weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions' in the employer's explanation," or it can be shown "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Id*. (internal quotation marks and citations omitted). In this case, while not specifically stated, Mr. Aspaas has elected to proceed under the *McDonnell Douglas* burden-shifting framework. *See* Doc. 28 at 11–25 (arguing pretext).

### 1. *Protected Activity*

"Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII." *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, *Boese v. Fort Hays State Univ.*, 462 F. App'x 797 (10th Cir. 2012). The "participation clause" provides that an employer may not retaliate against an employee "because [the employee] has . . . *participated in any manner* in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a) (emphasis added). "The participation clause is designed to ensure that Title VII protections are not undermined by retaliation against employees who use the Title VII process to protect their rights." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008) (internal quotation and citation omitted). The "opposition clause," meanwhile, provides that an employer may not retaliate against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C.A. § 2000e–3(a). *Id*.

### 2. *Materially Adverse Action*

In the context of a retaliation claim, a materially adverse action is an action "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

The parties do not dispute that removing Mr. Aspaas as a supervisor on and subsequently terminating him are materially adverse actions. Thus, Mr. Aspaas must establish a causal connection between his protected activity and these materially adverse actions of removing him as a supervisor and terminating his employment. In other words, Mr. Aspaas must show that a desire to retaliate against him motivated Ms. West and/or the Agency to take the materially adverse actions, *see Wells*, 325 F.3d at 1218, and also that that the person who took the adverse actions knew of the protected activity, *see Montes*, 497 F.3d at 1176.

a.   *Removal as Supervisor*

In this case, Mr. Aspaas's claim for retaliation fails for two reasons. First, his informal complaints are not protected activity under Title VII. Second, for any activity that was protected under Title VII, Mr. Aspaas does not present sufficient evidence from which a reasonable factfinder could conclude that Ms. West—who decided to remove him as a supervisor—had knowledge of any "protected activity."

Mr. Aspaas contends that complaining to his supervisor of "gender discrimination needs to be protected." Doc. 28 at 24. However, his informal and generic complaints about "reverse discrimination" are not subject to the protections of Title VII. The participation clause of Title VII "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1258 (D. Kan. 2001) (quoting *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)); *see also New v. Bd. of Cnty. Commissioners for Tulsa Cnty.*, 434 F. Supp. 3d 1219, 1226 (N.D. Okla. 2020) ("The participation clause protects an employee in providing information as part of a formal investigation by the EEOC and it does not

apply to participation in an internal investigation by the employer.") (citing *EEOC v. Rite Way Serv., Inc*., 819 F.3d 235, 239 n.2 (5th Cir. 2016); *Townsend v. Benjamin Enter, Inc*., 679 F.3d 41, 48-49 (2d Cir. 2012); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010)). Here, Mr. Aspaas made his first formal contact with an EEO counselor on August 19, 2015, *after* he was removed as a supervisor.  *See* UMF 81.  Consequently, Mr. Aspaas cannot show that he engaged in protected activity under the participation clause before he was removed as a supervisor, and the Court must analyze his activity under the opposition clause.

To qualify for protection under the opposition clause, Mr. Aspaas was required to convey his concern that the employer has engaged in an unlawful practice under Title VII.  *See Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  "General complaints about company management and one's own negative performance evaluation will not suffice." *Id*.  In addition, although he is not required to show that Ms. West actually discriminated against him based on his gender, he must show that when he engaged in protected opposition, he had a reasonable good-faith belief that she had done so.  *See Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004).

Mr. Aspaas appears to claim that his email to Ms. West dated March 26, 2015, constituted protected activity.  *See* Doc. 28 at 24 (arguing generally that complaining to one's boss about gender discrimination needs to be protected).  In the email, and after Ms. West had overruled his decision to deny one of his supervisee's training because she was pregnant, Mr. Aspaas stated, "I felt much discriminated against, call it reverse discrimination."  Doc. 22-8 at 1. He explained that he is a very experienced nurse, and a "person who respect[s] and honors life," and he was "saddened that this young lady would use her pregnancy as a tool to get her way rather than see the genuine concern for her health and safety."  *Id.*  In other words, he did not

deny that he told his employee that she could not attend a training because she was pregnant. *See id.* No reasonable jury could find that this claim of "reverse discrimination" conveys his good-faith belief that Ms. West's decision to overrule him and permit the employee to attend the training constituted discrimination against him because he was a man. This email does not constitute protected opposition activity.

Mr. Aspaas also appears to claim that his meeting in early June 2015 with an EEO counselor constituted protected activity. Doc. 28 at 25 ("The going . . . to EEO Liaison Counselor Jimmy Benally were all part of a process."). But Mr. Aspaas did not tell Mr. Benally at that time that he wanted to file an EEO complaint. Doc. 22-39 at 3 (Tr. At 10:14–16). Nor did Mr. Benally discuss this meeting with Ms. West or Mr. Tso. *Id.* at 4 (Tr. At 11:2–6). Because there is no evidence that Ms. West was aware of this meeting, she could not have removed Mr. Aspaas from being a supervisor because of it.

In a July 9, 2015 email to Mr. Tso about overtime, Mr. Aspaas included an allegation that since April 16, 2015, Ms. West had "single[d] me out, ignored, accused, harassed and avoided me, and discriminated against my gender." Doc. 22-40. Mr. Aspaas did not explain how Ms. West had discriminated against him based on his gender, *see id.*, and Mr. Tso interpreted the single sentence regarding "harassment and discrimination" as being tied to the denial of overtime, UMF 79. Mr. Tso did not discuss the alleged harassment and discrimination with Ms. West. UMF 80. Ms. West did not remember Mr. Tso discussing anything with her other than the overtime issue. *Id.* Again, because there is no evidence that Ms. West was aware of Mr. Aspaas's allegation of harassment and discrimination, Mr. Aspaas cannot prove that Ms. West removed him from his supervisory position because of it.

Ms. West removed Mr. Aspaas from his position as supervisor on August 14, 2015.  Mr. Aspaas made initial contact with an EEO counselor to make a formal complaint on August 19, 2015, and the counselor interviewed him on August 26, 2015—after he had been removed as supervisor.  UMF 81.  About a week after speaking to the EEO counselor, on August 31, 2015, Plaintiff submitted a letter to Mr. Tso, regarding a "hostile work environment," which he did not share with Ms. West.  UMF 82.  Ms. West first became aware of Mr. Aspaas's protected activity on September 3, 2015, when she learned of his EEO complaint.  UMF 83.  Consequently, Mr. Aspaas cannot establish the prerequisite to a prima facie case of retaliation —that Ms. West knew of his protected activity prior to removing him as supervisor—because the protected activity occurred after he had been removed.  Because Mr. Aspaas cannot establish the prerequisite to sustain a prima facie case of retaliation, defendant is entitled to judgment as a matter of law for his claim with respect to Ms. West removing him as supervisor.

### b.  *Charges of AWOL and Termination*

No reasonable fact finder could conclude that there was a causal connection between Mr. Aspaas's protected activity and his being charged with AWOL and his ultimate termination.  Following Ms. West removing him as a supervisor, she reassigned Mr. Aspaas to the ER and urgent care.  On August 20, 2015, six days after Ms. West reassigned him, Mr. Aspaas submitted a note from the VA clinic in Chinle that indicated that Mr. Aspaas had received medical care on that date and stating that he should be excused from work until September 8, 2015.  UMF 54.  In fact, Mr. Aspaas was diagnosed with PTSD on August 20th but never told Ms. West about his diagnosis.  UMFs 84, 85.  On September 8, 2015, Mr. Aspaas submitted a note from a medical care provider saying that he should be excused for an additional 10 days.  UMF 60.  Ms. West approved the leave requested but asked Mr. Aspaas to provide further documentation to justify

the absence.  UMFs 61, 62.  Between September 21 and October 2, 2015, Mr. Aspaas was on

previously approved leave.  UMF 63.  Upon his return on October 5, 2015, he was told by his

supervisor, Jim Priest, that he needed to get medically cleared to return to work.  UMF 64.  Mr.

Aspaas left the facility and did not return.  UMF 65.

Around October 8, 2015, Mr. Aspaas provided Ms. West with a note from a medical

provider that stated that he should not work until he was medically cleared.  UMF 66.  Mr.

Aspaas never provided a medical clearance for his return to work.  About a week later, when Mr.

Aspaas had been AWOL for nearly two weeks, Ms. West sent him a certified letter summarizing

his failure to follow the leave-requesting procedures.  UMF 67.  Mr. Aspaas never provided Ms.

West with an explanation for his extended absences.  Further, Mr. Aspaas never complied with

the leave-requesting procedures.  Ms. West recommended that Mr. Aspaas be terminated on

December 3, 2015, and the Agency terminated his employment and separated him from federal

service on January 22, 2016.  UMFs 71, 74.

Although Ms. West knew of Mr. Aspaas's protected activity by September of 2015, no

reasonable fact finder could conclude that his termination in January of 2016, four months later,

had any causal connection to Mr. Aspaas's protected activity.  *See Anderson v. Coors Brewing

Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[T]hree-month period, standing alone, is insufficient

to establish causation.").  Instead, Mr. Aspaas failed to follow the proper leave-requesting

procedures, failed to get a medical clearance to return to work, and failed to provide a sufficient

medical explanation for his extended absence, in addition to his shortcomings as a supervisor.

As explained at length above, the Agency has provided legitimate, non-retaliatory reasons for

charging Mr. Aspaas with AWOL and terminating his employment, and he has not shown that

these reasons are pretextual.  Defendant is entitled to judgment as a matter of law on Mr. Aspaas's retaliation claim.

      F.   <u>Mr. Aspaas Cannot Establish a Prima Facie Failure to Accommodate Disability Claim (Count II)</u>.

Mr. Aspaas claims that he is disabled because of PTSD, and that the Agency discriminated against him because of his disability.  *See* Doc. 28 at 25–28.  Although he "admit[s] he cannot do direct work as a 'registered nurse,'" he argues that the Agency should have worked with him to find him "a non-clinical nursing or administrative job he could do to protect his federal pension and status." *Id.* at 26.  The law, however, does not require this type of accommodation.

The Rehabilitation Act prohibits the federal government from discriminating against an "otherwise qualified individual with a disability."  29 U.S.C. § 794(a).  In employment discrimination cases alleging violations of the Rehabilitation Act, "[t]he standards used to determine whether this section [of the Rehabilitation Act] has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act [the ADA]."  29 U.S.C. § 794(d).  Like ADA claims, Rehabilitation Act claims can be proved either by direct evidence of discrimination or by following the *McDonnell Douglas* burden-shifting framework.  *See Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

To establish a prima facie case for failure to accommodate a disability, the plaintiff must show that (1) he is disabled; (2) he is otherwise qualified; and (3) he requested a plausibly reasonable accommodation.  *Exby-Stolley v. Bd. of Cnty. Commissioners*, 979 F.3d 784, 792 (10th Cir. 2020).  "The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), overruled on other grounds, *Bd. of Trustees of Univ. of*

*Alabama v. Garrett*, 531 U.S. 356 (2001).  Once a plaintiff alleges a prima facie claim, the employer may avoid liability "if it can prove the accommodation in question imposes an undue hardship on its business."  *Sanchez v. United States Dep't of Energy*, 870 F.3d 1185, 1195 (10th Cir. 2017).

In this case, Mr. Aspaas cannot establish a prima face case because he is indefinitely unable to work in any capacity.  For the purposes of his motion, defendant does not dispute that Mr. Aspaas was, at the time of his employment and termination, an individual with a qualifying disability under the Rehabilitation Act.  Doc. 22 at 32.  Assuming, however, that Mr. Aspaas was disabled, he fails to present sufficient evidence to demonstrate that he was "otherwise qualified."

A plaintiff is "otherwise qualified" for a position if "a reasonable accommodation would enable the person to perform the job."  *Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997).  "There are two components to the reasonable accommodation analysis.  *First*, whether a reasonable accommodation would enable the employee to do the particular job. . . .  *Second*, whether the employee could be transferred to other work which could be done with or without accommodation."  *Id*. (emphasis in original).

Here, Mr. Aspaas was not otherwise qualified for his existing position because no reasonable accommodation would enable him to do his job as a registered nurse.  By his own admission, Mr. Aspaas was completely unable to return to work "as a registered nurse on account of my illness and mental injury."  Doc. 22-44.  Mr. Aspaas did not indicate when he thought he would return to work as his disability "is a life[-]time mental illness and mental injury" for which he was undergoing medical treatment.  *Id*.  Thus, he could not do the particular job of registered nurse.  Further, Mr. Aspaas has not submitted any evidence that a medical

provider ever has cleared him to return to work in any position.  *See Smith v. Blue Cross Blue Shield of Kansas, Inc.*, 102 F.3d 1075, 1077 (10th Cir. 1996) (finding plaintiff was not a "qualified individual" at the time of termination because she conceded that she did not know if she would ever be able to return to work).

"The term 'reasonable accommodation' refers to those accommodations which presently, or *in the near future*, enable the employee to perform the essential functions of his job." *Cisneros*, 226 F.3d at 1129; *see also Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996).  Attendance is generally an "essential" function of any job.  *See Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998) ("Obviously, an employee who does not come to work cannot perform the essential functions of his job."); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) ("[A]n essential element of any job is an ability to appear for work . . . .") (citation, alteration, and internal quotation marks omitted).  An employer is not required to wait indefinitely for an employee to recover before terminating employment after an extended absence.  *See Smith*, 102 F.3d at 1077.  Mr. Aspaas cannot meet the requirement of being "otherwise qualified" because he was unable to return to the workplace for the indefinite future with or without an accommodation.  Consequently, there is no reasonable accommodation that would enable him to perform any job at CCHCF.[27]  Because Mr.

---

[27] Mr. Aspaas suggests that "[p]erhaps there was a non-clinical nursing or administrative job" to which he could have been reassigned.  Doc. 28 at 26.  Mr. Aspaas's speculation is insufficient to avoid summary judgment.  The Tenth Circuit has expressly held:

> at the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation.  *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999) ("To survive summary judgment, Plaintiff must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment.").

Aspaas cannot establish a prima facie case, defendant is entitled to judgment as a matter of law on Mr. Aspaas's failure to accommodate claim.

**V.     Conclusion**

For the reasons stated above, the Court finds that there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law because Mr. Aspaas cannot establish a prima facie case for his claims of intentional discrimination or hostile work environment based on his gender (Count III), for retaliation (Count I), or for a failure to accommodate his disability (Count II).

IT IS THEREFORE ORDERED that defendant Xavier Becerra, Secretary of the Department of the Health and Human Services' Motion for Summary Judgment filed on July 15, 2022 (Doc. 22) is GRANTED and plaintiff Anthony Aspaas's complaint is dismissed with prejudice.

Laura Fashing
United States Magistrate Judge
Presiding by Consent

---

*Duvall v. Georgia-Pac. Consumer Products, L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010).  Mr. Aspaas fails to meet this burden.